# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-01189-SCT

*GUY "PHIL" RUFF, JR.*

*v.*

*THE ESTATE OF GUY P. RUFF, SR., MYRA
EASON RUFF, IN HER CAPACITY AS
EXECUTRIX OF THE ESTATE OF GUY P. RUFF,
SR., MARGARET ANNE RUFF CARGO, IN HER
CAPACITY AS EXECUTRIX OF THE ESTATE OF
GUY P. RUFF, SR., AND DAVID CLIFTON RUFF,
IN HIS CAPACITY AS EXECUTOR OF THE
ESTATE OF GUY P. RUFF, SR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/18/2007 |
| TRIAL JUDGE: | HON. GLENN ALDERSON |
| COURT FROM WHICH APPEALED: | BENTON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | EDWIN H. PRIEST |
| ATTORNEY FOR APPELLEES: | STEPHAN L. McDAVID |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 08/21/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.

### WALLER, PRESIDING JUSTICE, FOR THE COURT:

¶1.     Guy "Philp" Ruff, Jr., received a personal loan from his parents Puddie E. Ruff and

Guy P. Ruff, Sr., now deceased.  Ruff defaulted on payments under the original loan

agreement, a subsequent bankruptcy consent order, and a later consent order entered in the

chancery court.  The Estate of Guy P. Ruff, Sr., filed a quitclaim deed in lieu of foreclosure

following Ruff's failure to make timely payment under the terms of the chancery court's consent order. Ruff sought injunctive relief, which the chancellor denied. Finding no abuse of discretion, we affirm.

**FACTS**

¶2. In June 2000, Guy "Philp" Ruff, Jr., (hereinafter "Ruff") executed two promissory notes in exchange for a loan of approximately $281,000 from his parents, Guy P. Ruff, Sr., and Puddie E. Ruff. The purpose of this loan was to enable Ruff to complete the development of his 298-acre cattle farm and bring all of his debts current. Ruff developed the farm for the benefit of Big Oaks Farm, LLC, in which he owned Class A and Class B shares. As consideration for his efforts, Ruff received "development fees" as well as distributions on his B shares.

¶3. Ruff failed to make any payments on the promissory notes. As a result, on May 22, 2002, Ruff's father filed a complaint against him in the Chancery Court of Benton County. On March 28, 2003, a default judgment was entered against Ruff for his failure to cooperate in discovery. Ruff's father obtained an equitable lien against the farm, compensatory damages in the amount of $357,678, and attorney fees and expenses in the amount of $4,600.

¶4. On February 4, 2004, one day before the scheduled foreclosure on the farm, Ruff filed for bankruptcy. Ruff's father filed a motion for relief from the automatic stay. On August 26, 2004, the bankruptcy court entered a consent order settling the motion for relief from the automatic stay (hereinafter the "Bankruptcy Consent Order"). Under this order, Ruff granted his father a third deed of trust on the farm property and a security interest in the cattle. He

2

further agreed to pay $16,500 per quarter to satisfy the remaining balance on his father's prior judgment. At the same time, Ruff assigned to his father the cash proceeds from his B shares. He also executed an assignment of all his financial interests in Big Oaks. This assignment was to be held in escrow by attorney Stephan L. McDavid, who served as counsel for Ruff's father, and would not become effective unless Ruff defaulted on his quarterly payments and failed to cure. So long as Ruff fulfilled his obligation to pay, he retained his right to collect distributions on his A shares, as well as any development fees owed to him from Big Oaks.

¶5. Following the Bankruptcy Consent Order, Big Oaks terminated Ruff's services on its behalf. Consequently, Ruff no longer received development fees or distributions on his B shares.

¶6. Ruff eventually defaulted on the quarterly payments and was sent a notice of default on March 21, 2005. On June 22, 2005, after more than sixty days had passed without cure, McDavid sent Ruff a notice of intent to release the assignment of all funds, disbursements, or income from Big Oaks. On July 19, 2005, the Estate of Guy P. Ruff, Sr.,[1] presented the assignment to Big Oaks with instructions that all previously withheld and future disbursements due Ruff be directed to the Estate (hereinafter the "2005 Assignment").[2]

---

[1] Sometime after the 2004 Bankruptcy Consent Order, Ruff's father, Guy P. Ruff, Sr., passed away and his Estate assumed his rights.

[2] After receiving notice of the assignment, Big Oaks suspended its June 2005 distribution on Ruff's A shares. Ruff and the Estate, however, dispute whether the June 2005 disbursement was ever actually paid to the Estate.

3

¶7.    As the Estate once again began execution on the farm, Ruff filed a Motion for Preliminary Injunction.[3] On February 8, 2006, the chancery court entered a Consent Order of Dismissal with Prejudice Based on Settlement of All Claims (hereinafter the "Chancery Consent Order"). Under the terms of this order, Ruff agreed to pay $2,000 each month. Ruff also executed a quitclaim deed in lieu of foreclosure to the Estate, to be held in escrow by McDavid. If payment was not received by the fifth day of the month, McDavid was entitled to file the quitclaim deed on the sixth day. The order also stated that "[e]xcept as specifically stated herein, the Note and Deed of Trust, and all obligations under the same and the [Bankruptcy Consent Order] remain in full force and effect. Nothing in this Order shall be deemed to otherwise modify any other obligations of the parties."

¶8.    Ruff made timely payments from February 2006 through November 2006, but failed to do so in December 2006. Around December 2006, the Estate received notice that the Bank of Holly Springs, which held a second deed of trust on the farm, was about to foreclose.[4] Based on Ruff's failure to make the December payment and the potential foreclosure, McDavid sent notices of default to Ruff on December 28 and 29, 2006, informing him that the quitclaim deed had been filed and that all personal property, including

_____

[3] Ruff asserted that he was entitled to a preliminary injunction under Mississippi Code Annotated 89-1-301 (Rev. 1999), which provides relief from inequitable foreclosures following a declared emergency or disaster, which in this case was Hurricane Katrina. Ruff also alleged that the Estate had fraudulently conspired to deprive him of his B shares and rendered him unable to pay his debt.

[4] It was later learned that the Bank of Holly Springs had not followed all of the proper foreclosure procedures.

the cattle, would be sold. Ruff was prohibited thereafter from using or accessing the farm property. To protect its interest in the farm, the Estate paid the Bank of Holly Springs note current.

¶9. On January 19, 2007, Ruff filed a Motion for Preliminary and Mandatory Injunction, Temporary Restraining Order and for Permanent and Mandatory Injunction. Ruff asserted that he had not made the December 2006 payment because he reasonably believed that the November 2006 disbursement on his A shares had been applied toward his debt to the Estate pursuant to the 2005 Assignment. Ruff argued that he stood to suffer immediate and irreparable injury because the Estate had interfered with his ability to care for the cattle, and because the Bank of Holly Springs' note contained an acceleration clause effective upon any transfer of interest.

¶10. Following a hearing, the chancellor denied Ruff's motion on June 27, 2007, in a written order, without making findings of fact. Ruff now appeals to this Court.

## STANDARD OF REVIEW

¶11. This Court reviews a chancellor's decision to deny an injunction for abuse of discretion. *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1207-08 (Miss. 2003). This Court "will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 13-14 (Miss. 2007) (quoting *Cummings v. Benderman*, 681 So. 2d 97, 100 (Miss. 1996)). Where the

5

chancellor makes no specific findings, this Court proceeds on the assumption that the chancellor resolved all fact issues in favor of the appellee. *City of Picayune v. Southern Reg'l Corp.*, 916 So. 2d 510, 519 (Miss. 2005) (citing *Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990)).

## DISCUSSION

**I.  Whether the chancellor abused his discretion in denying Ruff's request for a mandatory permanent injunction.[5]**

¶12.    Ruff argues that he is entitled to an injunction because the Estate gained an unconscionable advantage, and he suffered irreparable harm, due to his mistaken belief that Big Oaks' November 2006 distribution satisfied his December 2006 payment to the Estate. To prevent the intolerable injustice of him losing his farm and cattle based on a mere mistake, Ruff submits that the quitclaim deed in lieu of foreclosure should be set aside and the parties should be allowed to return to the status quo under the terms of the Chancery Consent Order.

¶13.    For a permanent injunction to issue, "a party must show an imminent threat of irreparable harm for which there is no adequate remedy at law." *Punzo v. Jackson County*, 861 So. 2d 340, 347 (Miss. 2003) (quoting *Reynolds v. Amerada Hess Corp.*, 778 So. 2d 759, 765 (Miss. 2000)).  A mandatory injunction is a harsh remedy that is not favored by

---

[5] In his assignment of error regarding the denial of injunctive relief, Ruff raises only the chancellor's denial of a permanent injunction.

courts, and should be used only in cases of great necessity. ***Punzo***, 861 So. 2d at 348

(quoting ***Pattillo v. Bridges***, 247 So. 2d 811, 812 (Miss. 1971)).

¶14.    Equity prevents an intolerable injustice where a party has gained an unconscionable

advantage by mistake and the mistaken party is not grossly negligent. ***Rotenberry v. Hooker***,

864 So. 2d 266, 271 (Miss. 2003).  The general rule provides that:

> [W]here the mistake is of so fundamental a character, that the minds of the parties have never, in fact, met; *or* where an unconscionable advantage has been gained, by mere mistake or misapprehension; and there was no gross negligence on the part of the plaintiff, either in falling into the error, or in not sooner claiming redress; and no intervening rights have accrued; and the parties may still be placed in statu quo; equity will interfere, in its discretion, in order to prevent intolerable injustice.

***Rotenberry***, 864 So. 2d at 271 (emphasis added) (quoting ***Miss. State Building Comm'n v.***

***Becknell***, 329 So. 2d 57, 60-61 (Miss. 1976)).

¶15.    Ruff does not seem to argue that the mistake was of such fundamental character that

the parties' minds never met.  Instead, he contends that "[a]ll four prongs set forth in

***Rotenberry*** are met and supported by the substantial evidence . . . ."

¶16.    The Estate, on the other hand, disputes that a mistaken belief caused Ruff's failure to

make the December 2006 payment.  But even assuming that he was mistaken, the Estate

argues that Ruff is not entitled to an injunction.  The Estate maintains that a chancellor is not

*required* to grant injunctive relief on a finding of a unilateral mistake, even if one party will

incur some injustice.  Rather, the chancellor retains discretion to grant or deny an injunction,

even though the evidence is sufficient for the chancellor to grant such relief.

7

¶17. We agree that even if Ruff satisfied all the conditions set forth in ***Rotenberry***, the chancellor nevertheless retained discretion on whether to grant equitable relief. After setting forth considerations for granting equitable relief, ***Rotenberry*** states that "equity will interfere, *in its discretion*, in order to prevent *intolerable injustice*." ***Rotenberry***, 864 So. 2d at 271 (emphasis added) (quoting ***Becknell***, 329 So. 2d at 60-61). Thus, even if all the conditions described in ***Rotenberry*** are present, the chancellor still reserves discretion on whether equity should interfere. *See* ***Rotenberry***, 864 So. 2d at 271 (quoting ***Becknell***, 329 So. 2d at 60-61).

¶18. Here, the chancellor conceded that Ruff had presented a good case for equitable relief. Ruff gave a reasonable explanation for not making the December 2006 payment. He knew that a distribution had been made on Big Oaks' A shares in November 2006,[6] and believed that his portion had been paid to the Estate pursuant to the 2005 assignment. His portion of the November 2006 distribution would have been sufficient to satisfy the $2,000 he owed the Estate for December.[7] Because of his omission, the Estate acquired the farm by filing the quitclaim deed in lieu of foreclosure. As a result, Ruff stood to lose his cattle herd and, potentially, to have the breed compromised.[8] Ruff asserts that the parties can be returned to

---

[6] Ruff knew that distributions had been made in June 2005 and November 2006 because his children had received their portions. Ruff had also confirmed the November 2006 distribution with his cousin, Mike Thomas.

[7] Ruff would have received approximately 1.33 percent of the $200,000 total distribution, which equals $2,660.

[8] Ruff had a purebred Brangus herd that was "beef cattle improvement association certified." According to Ruff, this made it important to maintain the integrity of the breeding system, and to meet certain health standards. He also fed his cattle using a "forage base

8

the status quo. He claims that he is able to bring all of his debts current, and is willing to reimburse the Estate for any expenditures.

¶19. After hearing all of the evidence, the chancellor granted the Estate's motion to dismiss. The chancellor reasoned that:

> [Ruff] has not lived up to any of his obligations on his loan from the very beginning. His father had to take him to court and get an equitable lien, he got that, and then he ran to Bankruptcy Court, and then he stopped at that, and then - - then went into court to - - in, what, 2002? . . . And now he's back before the court again today. He's lived up to none of it. He's even behind on the Federal Land Bank.[9] If it was just the simple fact of a $2,000 payment in November and that was it, I think you would have some merit. You say, Yes, it was an oversight. But the truth of the matter is he did not have the money, didn't have the money to pay the Bank of Holly Springs, that debt was due in September. He didn't have the money to pay the Federal Land Bank, that debt it due now. I'm going to deny your motion. I think that's the only fair thing to do. And I'm going to allow the deed in lieu.

¶20. We find that the chancellor did not abuse his discretion in denying Ruff's motion for injunctive relief. Ruff exhibited a pattern of failing to pay his debts and, at the time of trial, was in default on both the Federal Land Bank and Bank of Holly Springs's notes. Furthermore, Ruff's income prospects were suspect. He acknowledged that the farm itself did not generate income. He planned to bring his debt obligations current by using "family funds" and selling some of his cattle.

---

system," and feared this system would be disrupted.

[9] At trial, Ruff admitted that he was late on his obligation to the Federal Land Bank, which held a first deed of trust on the farm property.

9

¶21. Balancing the equities, Ruff's default also damaged the Estate. Ruff's parents had taken out a loan to finance their loan to him. The Estate continued to make payments on this loan, which was not kept current because of Ruff's default. The Estate's continuing obligation on this loan, combined with Ruff's failure to pay, contributed to a state of insufficient funds for the day-to-day living expenses of Mrs. Ruff. The Estate had to liquidate some of its assets in order to keep up Mrs. Ruff's living conditions.

¶22. As noted by the chancellor, equitable relief may have been appropriate if this had been an isolated incident. But given Ruff's history of default, we cannot say that the chancellor abused his discretion in refusing to impose a mandatory injunction.

¶23. Under this first issue, Ruff also argues that the Estate violated the terms of the Chancery Consent Order and the Bankruptcy Consent Order by: (1) filing the quitclaim deed when he was not in default; (2) intercepting disbursements due to him when such money could have been used to make his December 2006 payment to the Estate; and/or (3) failing to apply his disbursement toward the December 2006 payment. We decline to reach the merits of these arguments because these issues were not raised before the chancery court. *Hataway v. Estate of Nicholls*, 893 So. 2d 1054, 1057 (Miss. 2005) (citing *Ellis v. Ellis*, 651 So. 2d 1068, 1073 (Miss. 1995)). Consent orders are "in the nature of a contract" and are binding and conclusive in the absence of fraud, mutual mistake, or collusion. *Guthrie v. Guthrie*, 233 Miss. 550, 557, 102 So. 2d 381, 383 (1958). Ruff did not pursue equitable relief under a breach-of-contract theory. At trial, Ruff alluded to his desire for the Estate to abide by the terms of the Chancery Consent Order. Yet he never specifically argued that the

10

Estate had violated either consent order, and did not seek a determination as to the legal effect of such orders.[10]

**II.**     **Whether the chancellor abused his discretion in finding that the Estate had the right, as a matter of law, to intercept the disbursements due to Ruff, which could have been used to satisfy his scheduled payments to the Estate.**

**III.**    **Whether the chancellor erred in finding that the payments due to Ruff, and intercepted by the Estate, could not be applied toward his indebtedness to the Estate.**

¶24.    We find Issues II and III to be procedurally barred on appeal because these issues were not raised before the chancery court, *Hataway*, 893 So. 2d at 1057 (citing *Ellis*, 651 So. 2d at 1073), and because Ruff failed to cite relevant authority to support his arguments.[11]

*Tentoni v. Slayden*, 968 So. 2d 431, 441 (Miss. 2007) (citing *Huff-Cook, Inc. v. Dale*, 913 So. 2d 988, 991 (Miss. 2005)).  The chancellor's decision was limited to whether Ruff was entitled to injunctive relief based upon his mistaken belief.

### CONCLUSION

---

[10]    In its motion to dismiss, the Estate asked the chancellor to rule that the 2005 Assignment was in full force and effect.  While the chancellor expressed his interpretation that 2005 Assignment was in effect, he refused to grant the Estate's request because "that's not part of the pleadings."

[11]    Under Issues II and III, Ruff incorporated the authorities he had previously referenced under Issue I.  However, the authorities cited under Issue I concerned the issue of mistake, the requirements for a mandatory injunction, and the binding effect of a consent order.  Ruff failed to show how these authorities pertained to the Estate's rights or legal obligations regarding its handling of the disbursements.

11

¶25.   We find that the chancellor did not abuse his discretion in denying Ruff's request for injunctive relief.  Furthermore, because the grant or denial of injunctive relief was the sole issue before the chancellor, we do not address Ruff's remaining assignments of error.

¶26.   **AFFIRMED.**

**SMITH, C.J., DIAZ, P.J., EASLEY, CARLSON, GRAVES, DICKINSON, RANDOLPH, AND LAMAR, JJ., CONCUR.**