42 So.3d 25 (2009)
Thomas Lavirl SLADE, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2007-KA-01844-COA.
Court of Appeals of Mississippi.
September 29, 2009.
Rehearing Denied February 23, 2010.
Certiorari Granted February 23, 2010.
Certiorari Dismissed as Improvidently Granted August 5, 2010.
*26 John R. McNeal, Jackson, for Appellant.
Office of the Attorney General by W. Glenn Watts, for Appellee.
Before MYERS, P.J., IRVING and BARNES, JJ.
MYERS, P.J., for the Court.
¶ 1. Thomas Lavirl Slade was tried in the Circuit Court of Forrest County on one count of burglary, one count of possession of a firearm by a convicted felon, and one count of felony eluding law enforcement.[1] A jury was unable to reach a verdict on the burglary charge, but it found Slade guilty on the other counts. The trial court sentenced Slade as a habitual offender to life without eligibility for probation or parole on each count for which he was convicted. Aggrieved by his convictions and sentences, Slade appeals, arguing that the trial court erred in not granting his motions for change of venue and recusal. Finding no error, we affirm.

FACTS
¶ 2. At trial, the State put on numerous witnesses who described the authorities' encounter with and subsequent pursuit of Slade. Deputy Clifford Rudder of the Forrest County Sheriff's Department encountered Slade traveling at a high rate of speed in a black Ford Mustang on Highway 49 in Forrest County, Mississippi. Deputy Rudder recognized Slade, who was wanted in connection with several residential burglaries, activated the blue lights and siren on his patrol car, and gave chase at speeds ultimately reaching more than 120 miles per hour. Deputy Rudder also observed Slade run stop signs, force other vehicles off the road, and flee through several populated centers along the highway at dangerous speeds.
¶ 3. Slade was ultimately forced to abandon his vehicle after pursuing officers shot out one of his tires and disabled his vehicle with road spikes. Slade then fled on foot, armed with what was later identified as a.22-caliber rifle taken from the burglarized home. The pursuing officers testified that they observed Slade carrying the rifle and that he had pointed it in their direction and threatened them with it. Ultimately, an officer shot Slade after he pointed the *27 rifle in the officer's direction, and Slade was apprehended. The officers subsequently found a 20-gauge shotgun in the trunk of Slade's vehicle.
¶ 4. Slade took the stand in his own defense. Slade testified that he did not burglarize any homes, but he did admit that he pawned guns taken from the burglarized home on someone else's behalf to secure money to feed his addiction to crack cocaine. Slade testified that he feared the police because of past confrontations and because the "word on the street" was that the Forrest County Sheriff's Department would try to kill him. He admitted that he was "guilty of driving fast" during the pursuit, but Slade averred that he had fled because he feared the officers would kill him if he submitted.
¶ 5. Slade further denied threatening the officers with the rifle or pointing it in their direction. In the first encounter, Slade testified that he was out of shape and exhausted from the pursuit. Slade claimed to have been resting when an officer stumbled upon him and mistook his hunching over the rifle to catch his breath for an aggressive stance. Slade admitted that he had ordered the officer to leave, stating: "Boy, you better get out of here."
¶ 6. Slade testified that when he was shot by the second officer he encountered, he was also resting, squatting down, and leaning on the rifle with its butt planted on the ground and its barrel pointing up and away from the officer. On cross-examination, Slade admitted that he was a convicted felon, but he stated that he had taken the rifle "to survive on," apparently to defend himself from the authorities.
¶ 7. The jury did not reach a verdict on the burglary count, but it convicted Slade of possession of a firearm by a convicted felon and of felony eluding law enforcement.

DISCUSSION

1. Motion for Change of Venue
¶ 8. Prior to trial, Slade moved for a change of venue. The motion alleged that the incidents had received excessive pretrial publicity and that, as a result, he could not receive a fair trial in Forrest County. In support of his motion, he offered four affidavits and two online news articles.[2]
¶ 9. The trial court held a hearing on the motion, where it allowed the State to voir dire randomly selected members of the jury pool regarding their exposure to any pretrial publicity relating to the case. The State questioned five potential jurors; four stated that they had never heard of or discussed the case, and one testified that he had heard Slade's name mentioned on the news, but he could not recall any details.[3] The trial court offered to examine two additional veniremen, but Slade declined. The trial court then denied the motion for a change of venue, finding that the charges against Slade are "certainly not a topic of general discussion in the community, and nobody has formed any opinions one way or the other."
*28 ¶ 10. A trial court's decision as to whether or not to grant a change of venue is reviewed for abuse of discretion. Evans v. State, 725 So.2d 613, 646-47(¶ 98) (Miss.1997). However, this discretion is not unfettered. Pursuant to Mississippi Code Annotated section 99-15-35 (Rev. 2007), a defendant who files a proper application for a change of venue which is supported by two or more affidavits stating that the defendant cannot receive a fair and impartial trial in that particular county is entitled to a presumption that an impartial jury cannot be obtained. Evans, 725 So.2d at 647(¶ 99). However, this presumption can be rebutted by the State's presentation of evidence at the venue hearing "coupled with the trial judge's reasoned... sense of the community and ... an awareness of the uncontrovertible impact of saturation media publicity upon the attitudes of a community." Gray v. State, 728 So.2d 36, 65 (¶ 142) (Miss.1998) (quoting Fisher v. State, 481 So.2d 203, 215 (Miss.1985)). In some circumstances, the defendant may be entitled to an irrebuttable presumption that an impartial jury cannot be obtained. Evans, 725 So.2d at 647 (¶ 100). Elements that should serve to indicate an irrebuttable presumption include:
(1) Capital cases based on consideration of a heightened standard of review;
(2) Crowds threatening violence toward the accused;
(3) An inordinate amount of media coverage, particularly in cases of
(a) serious crimes against influential families;
(b) serious crimes against public officials;
(c) serial crimes;
(d) crimes committed by a black defendant upon a white victim;
(e) where there is inexperienced trial counsel.
Id. (citing White v. State, 495 So.2d 1346, 1349 (Miss.1986)). In any case, the prosecution can also rebut such claims by demonstrating that the impaneled jury members affirmatively stated that they could fairly and impartially serve as jurors if chosen. Gray, 728 So.2d at 66 (¶ 148).
¶ 11. On appeal, Slade argues that the trial court abused its discretion in denying his motion, asserting that he put on proof creating an irrebuttable presumption that an impartial jury could be not obtained in Forrest County because Slade was accused of serial burglaries, which had received an inordinate amount of media coverage.
¶ 12. The record, however, lacks any persuasive evidence of "inordinate" media coverage. Slade produced only two online news articles, both of which were apparently published immediately following Slade's arrest, and each of the affidavits produced by Slade simply asserted that the affiant "became aware of the charges against [Slade] through the local newspapers and media." Each of the five veniremen called by the State denied any familiarity with the details of the allegations against Slade, each had never discussed the case or heard it discussed, and each believed Slade could receive a fair trial in Forrest County.
¶ 13. Additionally, during voir dire the court asked the venire: "Do you know anything about the alleged facts of this case?" This elicited no response. Slade's counsel further questioned the jury panel as to whether any member had been exposed to any pretrial publicity, asking:
Is there anybody that recalls hearing about this on the news? ... [M]y understanding is that it did make the local news. Is there anybody that can recall some of those events? Maybe it's not real clear, but [do] you have kind of a fuzzy recollection of hearing something *29 about it on the radio or on the evening news?
This also elicited no response from the venire. This issue is without merit.

2. Motion for Recusal
¶ 14. Slade also appeals the trial court's denial of his pretrial motion for recusal. The supreme court has held:
The law surrounding the recusal of a judge in Mississippi is well settled. Under Canon 3 of the Code of Judicial Conduct, an appellate court, in deciding whether a judge should have disqualified himself from hearing a case uses an objective standard. A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality. The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application. This Court presumes that a trial judge is qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption. When a judge is not disqualified under the constitutional or statutory provisions[,] the decision is left up to each individual judge and is subject to review only in a case of manifest abuse of discretion.
Tubwell v. Grant, 760 So.2d 687, 689(¶ 7) (Miss.2000) (internal quotations and citations omitted).
¶ 15. Slade's motion for recusal did not spell out any specific grounds; however, at the pretrial hearing, Slade testified that he had prior dealings with the trial judge. Slade testified that before the Honorable Robert Helfrich, circuit judge, took the bench, the judge had previously represented him as defense counsel and had prosecuted him as an assistant district attorney. Slade also asserted that on one occasion[4] the trial judge had told him, "Thomas Slade, if it was left up to me, I would throw you away." Judge Helfrich acknowledged representing and prosecuting Slade in the past, but he denied making that comment. Judge Helfrich speculated:
Let me see if I can refresh your memory. I think what was probably said was the last timeand I don't know how many times I represented you or how many times I prosecuted you. Okay?
I think what was probably said was the last time you got whatever deal it was, and I don't even know what that deal was, that you told me, you know, this is it. You ain't coming back. And I probably said, well, I hope not, and if you do, you should be a man about it and stand up and take the max.
Slade disagreed, stating: "No, that ain't the way it went," and he maintained that Judge Helfrich had said he wished to "throw [Slade] away." Slade did, however, acknowledge that there had never been personal animosity between himself and Judge Helfrich. Judge Helfrich ultimately denied the motion, noting that because Slade was charged as a habitual offender, he would have no discretion in sentencing.
¶ 16. On appeal, Slade argues that the trial court abused its discretion in denying his motion because the trial judge "was predisposed to a maximum sentence for the defendant and had contemplated a maximum sentence" before hearing the evidence.
¶ 17. The fact that Judge Helfrich had both represented and prosecuted Slade in the past, without more, does not overcome the presumption of impartiality or require *30 recusal. See Beckum v. State, 917 So.2d 808, 816(¶ 31) (Miss.Ct.App.2005). We also note that Judge Helfrich denied ever stating that he wished to see Slade "thrown away," and Slade denied Judge Helfrich's suggestion that he might have said that, if Slade reoffended, Slade should "be a man" and take the maximum penalty.[5] Furthermore, the trial judge correctly noted that, because Slade was charged as a habitual offender, the trial court had no discretion in sentencing; therefore, the trial judge's impartiality as to sentencing cannot be reasonably questioned. This issue is without merit.

3. Weight and Sufficiency of the Evidence
¶ 18. Slade asserts the following as an issue in his brief on appeal: "The Court erred as a matter of law and abused its discretion by denying Appellant's Motion for New Trial or[,] in the alternative, a Judgment NotWithstanding [sic] the Verdict." Slade did not, however, support this issue with either argument or citations to relevant authority, and as such it is procedurally barred from our review. See, e.g., Ruff v. Estate of Ruff, 989 So.2d 366, 372(¶ 24) (Miss.2008). Notwithstanding the procedural bar, we find that the evidenceparticularly taking into account Slade's own testimonywas sufficient to support the verdict and that allowing Slade's convictions to stand will not sanction an unconscionable injustice. This issue is without merit.

4. Sentencing as a Habitual Offender
¶ 19. In his reply brief on appeal, Slade asserts that the trial court erred in sentencing him as a habitual offender. This issue, however, was not raised in the trial court or in his brief on appeal and is therefore procedurally barred from our review. See, e.g., Overstreet v. Allstate Ins. Co., 474 So.2d 572, 577 (Miss.1985) ("[I]t is well established that it is improper to raise new points or assignments for the first time in the rebuttal brief of appellant, and that where they are so raised, the Court is under no duty to consider the same." (citation and internal quotations omitted)). This issue is without merit.
¶ 20. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY OF CONVICTION OF COUNT IV, FELON IN POSSESSION OF A WEAPON, AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS *31 WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION; AND COUNT V, FELONY ELUDING LAW ENFORCEMENT, AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, WITH THE SENTENCES TO RUN CONSECUTIVELY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
IRVING, GRIFFIS, BARNES, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., LEE, P.J., AND ISHEE, J.
CARLTON, J., Dissenting.
¶ 21. I respectfully dissent in light of the language set forth in the Code of Judicial Conduct Canon 3E(1). In reviewing the particular facts of this case, utilizing the objective test set forth by Canon 3E(1)(a), I find that a reasonable person, knowing all of the circumstances, might question the trial judge's impartiality based on the possibility that the judge's prior dealings with Thomas Slade caused him to have a bias or prejudice against Slade.
¶ 22. Judge Robert Helfrich had both prosecuted and defended Slade in the past on unrelated charges. Additionally, Slade asserted that on one occasion in their past dealings, Judge Helfrich told Slade that he would like to see Slade "thrown away." Judge Helfrich denied making the statement and speculated that he told Slade that if he were ever accused of a crime again, Slade should "be a man about it and stand up and take the max." Slade disagreed with Judge Helfrich's recollection of their encounter.
¶ 23. I quibble not with either interpretation of the encounter between Judge Helfrich and Slade. I submit that recusal was appropriate under either scenario. The test in Canon 3E is not a subjective test  focused on whether the judge personally believes that his prior dealings with a party would raise a question of his impartiality. Rather, the test is objective  focused on whether a reasonable person, knowing all the circumstances, would question whether the judge had a personal bias or prejudice concerning a party.
¶ 24. The majority cites Beckum v. State, 917 So.2d 808, 816(¶ 31) (Miss.Ct. App.2005) as support for the proposition that Judge Helfrich's prior relationship with Slade, as a prosecutor and as a defense attorney, "without more, does not overcome the presumption of impartiality" or require recusal. The majority fails to consider, however, that Judge Helfrich himself stated that he probably told Slade that the next time he stood accused of a crime, he should "be a man ... and take the max." Judge Helfrich's statement indicates objectively that he had an opinion regarding Slade's guilt and appropriate punishment prior to Slade arriving in court.
¶ 25. In Beckum, the trial judge previously served as counsel for the defendant on a prior unrelated charge. Id. Prior to becoming a judge, the judge also worked in the district attorney's office that prosecuted the defendant on unrelated charges. Id. Further, the judge had recused himself from two other cases dealing with Beckum because the cases originated during the judge's employment with the district attorney's office. Id. However, the Beckum case did not deal with any extrajudicial statements by the trial judge in his previous professional capacities that reflected *32 an opinion on future sentence or disposition Beckum ought to receive if he were to be prosecuted for another crime. Therefore, I find the Beckum case factually distinct from the case before the Court.
¶ 26. The majority explains that the trial judge found that because Slade was charged as a habitual offender, the trial court possessed no discretion as to sentencing. For that reason, the majority states, Judge Helfrich's impartiality as to sentencing could not be reasonably questioned. However, Slade enjoyed the presumption of innocence until convicted by a jury, and he was entitled to a fair trial as to his guilt or innocence. U.S. Const. amend. XIV, § 1; see also Schmidt v. Bermudez, 5 So.3d 1064, 1074(¶ 19) (Miss. 2009) (holding that a reasonable person knowing all the circumstances could harbor doubts as to the chancellor's impartiality when the chancellor's combative and antagonistic conduct showed extreme bias). The imposition of a sentence was not Judge Helfrich's sole duty or sole decision in this case. Rather, this case involved various rulings during the course of the trial, including a ruling on the defendant's motion for a change of venue. Under an objective test, a reasonable person knowing all the circumstances, including the disputed statement as to future punishment and knowledge gained from previous representation, could question Judge Helfrich's impartiality in making those determinations.
¶ 27. In the recent United States Supreme Court case of Caperton v. A.T. Massey Coal, ___ U.S. ___, ___, 129 S.Ct. 2252, 2254, 173 L.Ed.2d 1208 (2009), the United States Supreme Court explained that instances existed where due process required recusal, in addition to situations where the judge possessed a direct, personal, substantial, or pecuniary interest in the case. The Caperton Court identified instances that, as an objective matter, required recusal where "the probability of actual bias on the part of the judge or decisionmaker was too high to be constitutionally tolerable[.]" Id. (quoting Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). The Caperton Court relied on its holding in In re Murchison, 349 U.S. 133, 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), where a judge had determined in an earlier proceeding whether criminal charges should be brought for perjury and contempt of court and then proceeded to try to convict the petitioners. Id. The Caperton Court explained its holding in Murchison, stating that the judge's prior relationship with the defendants, as the one who charged them with the crimes, as well as the information acquired from the prior proceeding was critical. Id. Further, the Caperton Court then explained that its previous decision in Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), rested on the relationship between the judge and the defendant. Id. The Supreme Court explained that the objective inquiry is not whether the judge was actually biased, but whether the average judge in his position is likely to be neutral or whether an unconstitutional "potential for bias" exists. Id. (citing Mayberry, 400 U.S. at 466, 91 S.Ct. 499).
¶ 28. Based upon the foregoing reasons and in light of the prior relationship between Slade and Judge Helfrich, including the information gathered as a result of the prior relationship and the communications between the judge and Slade, I respectfully dissent. I would reverse Slade's conviction and sentence and remand this case for a new trial.
KING, C.J., LEE, P.J., AND ISHEE, J., JOIN THIS OPINION.
NOTES
[1] Slade was indicted on three burglary counts, but he was only brought to trial on one.
[2] While both articles are undated, on our review it is apparent that both were published shortly after Slade's arrest. One refers to his capture as occurring "yesterday," and the other refers to the events as happening "Tuesday morning."
[3] After the prosecutor read the charges against Slade, the venireman stated that he recalled hearing of them but testified that he knew no other details of the incidents and that he had never discussed them, or heard them being discussed. He also testified that he had not formed an opinion on Slade's guilt or innocence and that he believed Slade could receive a fair trial in Forrest County.
[4] Slade stated that he could not remember "years and dates," and he did not state in what capacity Judge Helfrich had made the statement.
[5] Here, the dissent makes two assumptions that we find are unsupported by the record. First, the dissent assumes that one account or the other must be true. Judge Helfrich, however, repeatedly denied any specific recollection of Slade's prior cases; he did not offer a competing recollection. Instead, Judge Helfrich, apparently giving Slade's account the benefit of the doubt, offered what he "probably said," imagining himself as an assistant district attorney warning Slade that he would face sentencing as an habitual offender for his next offense. Judge Helfrich used the qualifier "probably" no less than three times-this was no admission that any such conversation took place. Slade, who claimed a better memory, specifically denied that an exchange as suggested by Judge Helfrich had occurred, insisting that Judge Helfrich had said he wished to "throw [Slade] away."

Second, although the dissent recognizes that Judge Helfrich had no discretion in sentencing Slade, it suggests that Judge Helfrich speculated he had told Slade to "be a man ... and take the max" if he ever stood accused of another crime. While this is crucial to the dissent's argument, it is a strained interpretation of what Judge Helfrich actually said. The more reasonable and probable interpretation is that Slade should accept responsibility only if he actually reoffended. Slade himself does not argue that Judge Helfrich suggested Slade should plead guilty if he were merely accused; Slade's argument is only that Judge Helfrich indicated that he was predisposed to a severe sentence.