# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2025-CA-00569-SCT

*JOHN CLAY ASHFORD*

*v.*

*BEULAH FAYE BELCHER*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/05/2025 |
| TRIAL JUDGE: | HON. LAWRENCE LEE LITTLE |
| TRIAL COURT ATTORNEYS: | TRENT L. HOWELL |
| | JAMES BRANDON JUSTICE |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JERRY WESLEY HISAW |
| ATTORNEY FOR APPELLEE: | JAMES BRANDON JUSTICE |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 06/11/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**COLEMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     John Clay Ashford appeals the Lafayette County Chancery Court's judgment confirming Beulah Belcher's title to disputed property and holding that her property had not been adversely possessed. There being no reversible error, we affirm the trial court's judgment.

## STATEMENT OF FACTS

¶2.     Beulah Belcher first laid claim to the property when she moved to Mississippi in 1984 based on a warranty deed from her parents. Belcher's deed contained the following legal description:

One acre of land in the North Half of Section 15, Township 10 South, Range 4 West.

Beginning at a point 200 yards South of the North Section line of Section 15, Township 10 South, Range 4 West, and 200 yards East of the Illinois Central Railroad right-of-way, and run thence East 210 feet to a point; run thence South 210 feet to a point; run thence South 210 feet to a point; run thence West 210 feet to a point; and run thence North 210 feet to the point of beginning, containing one acre of land lying and being situated in Lafayette County, Mississippi.

And being that certain property conveyed to Nathaniel Carr by deed from Mrs. C. C. Fite, Miss Linda Fite, and Mrs. Julia Taylor (sole heirs at law of C. C. Fite) dated July 13, 1963 and recorded in the records of the Chancery Clerk at Oxford, Mississippi.

¶3.    All parties agree that the deed does not describe the 1.5 acres that Belcher has claimed since 1984, but rather it describes land located about two hundred yards to the south. Despite the erroneous description, the 1.5 acre tract is the property Belcher has always believed she owned. Belcher's parents purchased the property from Nathaniel and Louise Carr in 1982. The Carrs purchased the property from the Fite family in 1963. At trial, Raymond Carr, Nathaniel Carr's cousin, testified that the disputed property was the same property where Nathaniel Carr once lived and where the Springdale school house was once located.

¶4.    Belcher had two sisters, Bessie Jones and Cora Jenkins. Bessie Jones is deceased, and Belcher was eighty-four years old at the time of trial. Belcher, Cora, and Bessie all lived on the disputed property sporadically. Belcher also allowed Dora[1] to operate a beauty shop out

---

[1] Confusingly, the record refers to Dora Jenkins as well, but Cora and Dora appear from the record to be the same person.

2

of a mobile home on the property for a time. At one time, three mobile homes were on the property. Cora lived there the first time from 1986 to 1989. Belcher and Bessie were also living there at that time. Cora lived there a second time from 1994 to 2000. Belcher testified that Bessie lived continuously on the disputed property from 1992 to 2012. Both Cora and Bessie lived there with Belcher's permission. Initially, Bessie and Cora paid rent directly to Belcher, but at some point they began paying two hundred dollars per month directly on a loan with Mechanics Bank in lieu of rent. According to Cora, their payments were for their mobile homes, not for the purchase of the land. Clevon Belcher, Belcher's daughter, testified that she lived at the subject property from 1988 until she entered the Navy in 1992. On Clevon's discharge papers, the subject property is listed as her address at the time she entered the Navy. Clevon testified that Cora and Bessie both lived on the subject property with Belcher's permission.

¶5.     In 2000, John Ashford Sr. filed suit to quiet and confirm title to 59.61 acres in Section 10 and 5.8 acres in Section 15 for a total of 65.41 acres. Robert McCain surveyed the property for the quiet-and-confir- title suit. The disputed 1.5 acre tract was not included in the 65.41 acres. McCain and abstractor Frank Wood both testified that there were problems with the descriptions of Ashford Sr's property, which was why the quiet-and-confirm-title suit was necessary. The deed that Ashford Sr. possessed "erroneously described land miles away." Ashford Sr. then had Belcher, Bessie, and Cora served with the complaint to quiet and confirm title to land, although Belcher was no longer living on the property at that time.

3

Ashford Sr.'s complaint acknowledged that Belcher owned property in the vicinity but did not have a deed to the tract where the mobile homes were located. The complaint did not make any statement that would indicate that Ashford Sr. was claiming ownership of the 1.5-acre tract. Bessie filed a handwritten response that acknowledged Belcher owned the land on which they were living, but Bessie believed the payments she and Cora made toward the loan were for the purchase of the land and two mobile homes.

¶6. In April of 2001, Ashford Sr. had McCain survey the 1.5-acre tract and prepare a legal description. On April 13, 2001, Ashford Sr. executed a quitclaim deed that appeared to convey the 1.5-acre tract to Bessie Jones. Prior to 2001, the Lafayette County Tax Assessor had assessed the 1.5-acre tract to Ashford Sr. as part of a larger tract of land. Also prior to 2001, the tax assessor had assessed taxes for one acre of land to Belcher, who paid taxes each year since 1984. After 2001, the location of the parcel originally assigned to Belcher was no longer designated on the tax map; however, the tax card for the 1.5-acre tract contained Belcher's original deed reference and several notes made by the tax-office employees. One states, "Both Bessie Jones and Beulah Belcher are claiming the same property in Section 10." Another states, "Beulah says [mobile home] belongs to Bessie - Beulah only wants to pay on land." The tax office created two parcel numbers for the 1.5-acre tract. One parcel number was in Bessie's name, and the other was in Belcher's name. Due to her age, Bessie was exempt from paying any taxes, but Belcher paid taxes on the 1.5-acres each year beginning with the 2002 taxes.

4

¶7. After 2000, letters addressing the issue were written to Belcher and to an attorney, now deceased, who sometimes represented her. She consulted with legal services, and in 2008 had an attorney send a letter to Bessie about the land. Belcher testified that she and Bessie reconciled and that she continued to allow Bessie to occupy the land, but from then on, both Belcher and Bessie claimed ownership of the property and regularly borrowed money using the land as collateral. Belcher's deeds of trust contained the legal description in her deed, and Bessie's deeds of trust contained the legal description from her quitclaim deed.

¶8. On January 16, 2012, Bessie executed a quitclaim deed conveying the 1.5-acre tract back to Ashford Sr. At that point, the dispute between Belcher and Bessie evolved into a dispute between Belcher and the Ashfords. After the deed from Bessie to Ashford Sr., the Ashfords have paid taxes on Parcel 151-10-06-B, and Belcher continued to pay taxes on Parcel 151-10-006-C. Ashford Sr. passed away in 2013. His real property was devised to his two children, Christy Ashford and John Clay Ashford (the defendant in the case). Christy Ashford later conveyed her interest in the property to Ashford by quitclaim deed. Neither the deed description nor the survey attached to the deed contain the 1.5-acre tract. At some point in time, although Ashford could not remember exactly when, Ashford saw dirt being deposited on the 1.5 acres. He placed a sign on the property that stated, "No Dumping, John H. Ashford Estate" and included his telephone number. Ashford could not remember when he did that, and he could not even say in what year that occurred. Belcher testified that two

or three years before, Cora's grandson attempted to put a mobile home on the subject property but had to move it due to a problem with the septic system. Ashford testified that a mobile home was placed on the property. He reported it to the Lafayette County Sheriff's Department, and a deputy went to investigate. When questioned about the result of the investigation, all Ashford said was that it had been investigated. He did say that the mobile home remained there for eighteen months. Belcher testified that she paid someone to cut the grass on the property for the last two to three years.

## ISSUES RAISED ON APPEAL

1.  Whether the chancellor erred by finding that the permission given by Belcher to Bessie precluded Bessie from acquiring title by adverse possession.

2.  Whether the chancellor erred by finding that Bessie did not adversely possess the disputed property from 2001 until 2012.

## STANDARD OF REVIEW

¶9.  "This Court 'will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.'" *Ruff v. Est. of Ruff*, 989 So. 2d 366, 369 (Miss. 2008) (quoting *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 13-14 (Miss. 2007)). However, a chancery court's interpretation and application of the law are reviewed under a de novo standard. *Madison Cnty. v. Hopkins*, 857 So. 2d 43, 47 (Miss. 2003); *Tucker v. Prisock*, 791 So. 2d 190, 192 (Miss. 2001); *Adams v. Carney (In re Will of Carney)*, 758 So. 2d 1017,1019 (Miss. 2000).

6

## ANALYSIS

**1.  Whether the chancellor erred by finding that the permission given by Belcher to Bessie precluded Bessie from acquiring title by adverse possession.**

¶10.  The requirements for adverse possession are set out in Mississippi Code Section 15-1-13, which provides as follows:

> Ten (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title . . . .

Miss. Code Ann. § 15-1-13(1) (Rev. 2019).  The statute establishes that title is automatically vested in the adverse possessor after ten years of adverse possession, without any need to record or quiet title.

¶11.  The court in *Fant v. Williams* explained the nature of title acquired through adverse possession, stating that "possession for ten years in accordance with the demands of the statute confers such title upon the occupant as can be used defensively or as a basis of a bill to confirm title.  It is such title that will support an action in court." *Fant v. Williams*, 118 Miss. 428, 79 So. 343, 345 (1918).

¶12.  The court further defined the necessary elements for adverse possession in *Rice v. Pritchard*, 611 So. 2d 869, 871 (Miss. 1992), stating that "for possession to be adverse it must be (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful."

7

¶13.    In ***Johnson v. Black***, the court addressed permissive possession, writing,

> possession with permission of the record title holder is never sufficient to establish adverse possession and ripen into title in the adverse possessor no matter how long continued.   Permissive possession of land does not confer title in the person in permissive possession until a positive assertion of right hostile to the record title holder has been made known to him.

***Johnson v. Black***, 469 So. 2d 88, 91 (Miss. 1985) (citations omitted).

¶14.    Ashford argues that because Belcher was not the true title owner when Bessie moved onto the property, the permission Belcher granted to Bessie does not defeat adverse possession.  However, the Court of Appeals held in ***Roberts v. Young's Creek Inv., Inc***., 118 So. 3d 665 (¶ 13) (Miss. Ct. App. 2013), and in ***Anderson v. Fisher***, 296 So. 3d 124 (¶ 20) ( Miss. Ct. App. 2019), that charging rent strengthens one's claim of ownership to adversely possessed property.   Additionally, Bessie believed she was living on the property with the permission of the true owner and, therefore, was not making a claim of ownership herself, which is a required element of adverse possession.  *See  Rice*, 611 So. 2d at 872. Bessie only began claiming ownership when she received the quitclaim deed in 2001, but by that time, Belcher had satisfied all of the elements of adverse possession and was the true title owner.

¶15.    Applying the adverse-possession test defined by *Rice* to Belcher, she satisfies all necessary elements:

1.      Belcher claimed ownership of the lot on which she and her sisters lived based upon the inaccurate deed she received.

8

2    Her claim was actual or hostile because she occupied the property and allowed others to occupy it with her permission.

3.    Her possession was open, notorious, and visible, as she made no effort to conceal her occupancy and paid taxes on the property.

4.    She possessed, or charged others to occupy, the property continuously for at least ten years, from 1986 to 1996.

5.    She held an exclusive claim of ownership during that ten-year period.

6.    Her occupation and possession of the property was peaceful in that no one attempted to remove her from the property.

¶16.   Once Belcher satisfied the necessary elements of adverse possession, title automatically vested in her.

¶17.   Belcher testified that she gave permission to Bessie to live on the disputed property beginning in 1986, with Bessie paying two hundred dollars per month in rent to Belcher and later making payments directly on a loan to Mechanics Bank for the mobile homes. The only time Belcher withdrew permission or sought Bessie's removal from the property was around 2001, when she took Bessie to court in Lafayette County and had an attorney draft a letter seeking her removal. However, the record does not show whether the letter was ever sent, and Belcher testified at trial that the two reconciled and that she continued to allow Bessie to live on the disputed property with her permission until Bessie moved to an assisted living facility in 2012. At that time, Bessie executed a quitclaim deed for the disputed property back to Ashford Sr., from whom she had originally received the deed.

¶18. Based upon the analysis above, the trial court did not err when it found that permission given by Belcher could preclude Bessie from acquiring title by adverse possession.

**2. Whether the chancellor erred by finding that Bessie did not adversely possess the disputed property from 2001 until 2012.**

¶19. Regarding when permissive possession ends and hostile possession begins, "[t]he statute of limitations does not run in favor of a tenant against his landlord until there has been an assertion of hostile claim or title by the tenant brought to the knowledge of the landlord." *Holman v. Bonner*, 63 Miss. 131, 134 (1885).

¶20. The court also explained what *peaceful* means as it relates to adverse possession, writing,

> We do not think these verbal statements are sufficient. There must be either a suit during the time before the expiration of the ten-year period or there must be a physical interruption of the adverse possession, or some unequivocal asserting of the claimant's rights, which would enable the person in possession to institute legal proceedings in trespass or otherwise to prevent acts of ownership.

*Daniels v. Jordan*, 161 Miss. 78, 134 So. 903, 904 (1931).

¶21. The court applies an elevated standard of proof when a case involves familial adverse possession: "to the effect that as between parties sustaining parental and familial relations, the possession of the land of one by the other is presumptively permissive or amicable, but . . . the presumption is not conclusive." *Randall v. Mitchell*, 41 So. 2d 44, 46 (Miss. 1949).

10

¶22. Bessie began claiming the property as her own after receiving the quitclaim deed from Ashford Sr. in 2001. She began listing the property on her taxes, although she did not pay any taxes due to her advanced age. She also used the land as collateral for loans and granted easements. Belcher, however, had paid taxes continually since purchasing the property in 1984, and she also used the property for collateral for loans and granted easements. Upon learning of Bessie's claims, Belcher hired an attorney and attempted to have Bessie removed, but she testified at trial that they later reconciled and that she ceased her attempts to remove Bessie because she was her sister.

¶23. In Mississippi, for permissive possession to become hostile, there must be notice to the landlord of a hostile claim. *Holman*, 63 Miss. at 134. In the present case, Belcher received notice of her sister's claim when the tax office sent letters to both parties indicating that they were paying taxes on the same property around the year 2000. Belcher contested her sister's claim, and in 2008 she had an attorney draft a letter to initiate proceedings to remove Bessie from the property. The letter could be sufficient to interrupt the peaceful possession element of adverse possession as discussed in *Daniels*, 134 So. at 904, but it is unclear from the record whether the letter was ever sent, and it does not sufficiently interrupt the peaceful-possession element.

¶24. However, Belcher testified at trial that she stopped attempting to have her sister removed from the property, thereby allowing her to remain and effectively reinstating permissive possession. The record is unclear as to when the reconciliation occurred and

whether Bessie resumed paying rent after Belcher ceased her eviction efforts. Mississippi law indicates that permission defeats adverse possession, and possession among family members is presumed to be permissive unless the facts clearly show otherwise. *See Johnson*, 469 So. 2d at 91; *Randall*, 41 So. 2d at 46.

¶25. In the present case, no sufficient evidence proved that Bessie adversely possessed the property for ten years. The facts indicate that she may have adversely possessed the property from 2001 (when Belcher received notice of the quitclaim deed) until approximately 2008 (when the eviction letter was drafted). After that point, Belcher testified that she and Bessie reconciled and that she stopped seeking Bessie's removal. Given the reconciliation and the standard set forth in *Randall* that possession among family members is presumed permissive, we hold that the trial court did not err by concluding that Bessie did not adversely possess the disputed property from 2001 to 2012.

## CONCLUSION

¶26. The trial court did not err by determining that the permission given by Belcher to Bessie precluded Bessie from adversely possessing the property and that Bessie did not adversely possess the disputed property from 2001 until 2012. Accordingly, the judgment of the Lafayette County Chancery Court is affirmed.

¶27. **AFFIRMED.**

**RANDOLPH, C.J., KING, P.J., ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**

12